2021-40186 Justin Tyler Davis v. Lt. Christine Gentry, also known as Kristen Zimbrano. May it please the Court. Even accepting Davis' version of the facts as true, his delivered indifference claim fails for three independent reasons. First, he has not met his burden to show a case sufficiently analogous to this one to overcome Qualified Immunity's clearly established prompt. Second, he has not shown that Lt. Gentry subjectively drew an inference of a substantial risk of serious harm. And third, he has not shown that Lt. Gentry disregarded that risk. I'd like to begin with Qualified Immunity's clearly established prompt. Both this Court and the Supreme Court have held time and again, in cases such as White v. Pauley, Mullenix, and Estate of Joseph, that the clearly established analysis must not be performed at a high level of generality, but instead must be particularized to the facts of the case. Can you address why Lawson is not particularized enough that the doctor ordered that Davis be allowed to use her cane, I mean his cane, and that he was then forbidden from using his cane, so it's defying the doctor's order? Why isn't that specific enough? Can you address that, please? Yes, Judge Elrod. I think there are two answers to that question. The first is that Lawson was a case in which nurses delayed treatment for a lengthy period of time over a course of several visits, but I think the main distinction is that there wasn't anything in that case about disregard. In Gentry's case, there is a difference about disregarding a risk. In other words, in the Lawson case, it appeared that the nurses were simply not following the doctor's orders. But in Gentry's case, she went out of her way to help Mr. Davis. Isn't that a fact issue of whether she was actually helping him or not, or setting him up to fail? I mean, isn't there two versions of this where she says, oh, we're going to help you, and got these two officers, and they're going to prop him up as you support him, and then there's the, they said, don't use your cane, and then they stood there and watched him fall on his face. Accepting Davis's version of the facts is true for purposes of appeal, and this is at record 484 and at record 770 and 771, which are Davis's own affidavit and Davis's own testimony at the Spears hearing. His testimony was that Lieutenant Gentry said, well, don't worry about the cane, we're going to help you. Right, but what she said is not necessarily what she did. She could have been lying to him. We don't know whether they helped him or were there, what their intent was. All of this, of course, happened over the course of just a few seconds, and accepting Davis's version of the facts is true for purposes of this appeal. The cell door opened, he dropped his cane, he took one step, and he fell, and his own testimony was that, quote, the officers were standing there kind of like ready to grab me. Now, unfortunately, he fell very quickly over the course of just a couple of seconds. Well, isn't the question what she did say? Because if she's directing them to care for him, how can that, I mean, it's not like she met with him outside and said, hey, just let him fall, and then went in and said, oh, take care of him. She walks out there and says, take care of him. There's no indication that she told them anything otherwise, and he admits to that. Isn't that the key part of this case, her directive? We believe so. That she directed him. Which is different from just saying, throw your cane away, and I don't care what happens to you. Those are two very different statements, regardless of what's in her head. Mr. Mendelson, this was not an order to the officers that said you are going to support him. This was a statement to him that said, don't worry, we're going to support you. There's no indication that she ever made an order to the officers to support him. Is there in this record? You're surmising something about what the statement means that it was actually an order to the officers. This was not an order to the officers, was it? I don't think I agree with that, and this is record 818. Yes. Tell us exactly what it says. And is she addressing the officer, or is she addressing him? So this is in Officer Sands' affidavit, and what he says is she also assured Davis that we would assist him so he would not fall. Right. That's not the same thing as her telling them that they need to assist him. That's not an order to the officers. That's an assurance to the man, Mr. Davis. That was to Officer Sands. But yes, we think that that statement that Officer Sands made in combination with her statements to Mr. Davis definitely suggests that she had told those officers, or at the very least intended for those officers, to help Mr. Davis. There's nothing in the record that says one way or the other on that, except that they're there. You could say, I would give you that they're there, and they're standing there, and so maybe they're there to help him and not just to stand there and laugh at him fall. Mr. Davis' version of the facts also say that the officers were standing there, quote, kind of like ready to grab me, and I think that statement also suggests that they were planning to do so. But if the court disagrees with that, I think it's also important to note that even under Mr. Davis' version of the facts, what separates this case from the only published opinions of this court that he has cited, which is the Easter case and the Lawson case, is at the very least, her statements show that she was trying to help him in some way, that she was trying to take steps to mitigate the risk of a fall. Do they actually show that? Because her telling him that she's going to help him, we don't know what's in her heart. If she's actually intending to help him or not. It could be just the opposite. We have no way of knowing on this record whether she actually intended to help him or if she intended to trick him. There's certainly nothing in the record that would suggest that she... Well, he fell immediately after not being allowed to use the cane that he was supposed to be allowed to use under the doctor's orders. That's, it's certainly correct that he fell in just a period of a couple of seconds. But if the court... Is there any indication that she knew him before this? No, in fact, her own affidavit... Is there any indication that she was out to get him? No, there's not. There's nothing in the record that suggests she was trying to find a way for him to be handcuffed because he needs to be handcuffed, but at the same time, keep him safe. That's correct. And I do want... So that's what you believe from the way you read the record? We think that even accepting Davis's version of the facts as true, that is correct. And yes, there is certainly nothing in the record that would suggest... It's not indicated any problem with her before or even any interaction with her before, just after, not before. That's correct. And also her own affidavit states that she had never encountered him before this incident. But I think the difference between the Easter case and the Lawson case is this case, is there was some effort on her part. If the court doesn't believe that she instructed the officers to do so, certainly her own statements and certainly when he fell, her immediate decision to call for medical aid shows that she was trying to help him in some way. And that's what makes this case different from the Easter case and the Lawson case. Well, and she's not a nurse. I mean, to me, the medical situation where a doctor tells another medical person to do X is a little bit different from a doctor saying, oh, you're supposed to take these medicines or, oh, you're supposed to use a cane to the rest of the world. Right. Is that fair? Yes. That's another distinction. But doesn't it cut the other way? Because they're not medical people, they need to follow the doctor's commands and not second guess the doctor. And I think I want to be clear on that point, that we're not suggesting that in every case it is categorically, objectively reasonable for qualified immunity purposes for a corrections officer to ignore some type of medical pass such as a cane pass. And this is a really easy thing to follow. I mean, it's direct, it's clear, we know what a cane is, it's not some complicated, hard medical thing. Sure. And I think that's also a reason why under the particular facts of this case, and we're not suggesting that in all cases it would be okay for an officer to ignore some type of medical pass. It was on these facts that she understood they were only going 15 yards to the shower, that she understood he was a younger man, not an older man who might have trouble walking a long distance. She also understood that he was a high security inmate, and so some type of restraints, as Judge Haynes was referencing, were necessary and of course were also part of the policy. And under those particular circumstances, not generally as a categorical matter, we think a reasonable officer could have made this decision. Well, my point about not being a nurse isn't necessarily about prong one, it's about prong two. Is it clearly established what she's supposed to do when we're talking about what a nurse was supposed to do? No, we certainly don't believe so, and more importantly, it would be Mr. Davis' burden to show a case like that, and as Your Honor suggested, cases— Well, maybe we need to set a standard if there's not one, because we need to say that people should follow doctor's orders and not second guess them. Well, that's a different question though, right? Well, I wouldn't want to ask that question. Because that's not the clearly established, that's prong one. That's the question I want— Should we address prong one even if we agree with you on prong two? The court, of course, may use its discretion under Pearson v. Callahan to say that assuming arguendo there might have been a constitutional violation under prong two, it wasn't clearly established, or at the very least, that Mr. Davis hasn't met his burden, because cases like Taylor and cases like McCoy and Easter v. Lawson or Powers v. Snyder from the Second Circuit are just not factually analogous to this case, so the court may use its discretion under Pearson v. Callahan. So we have a choice on whether to address prong one if we end up ruling in your favor on prong two? If the court were to address prong two first, the clearly established analysis, it wouldn't be necessary to address prong one. Right, but we're asking, Pearson, we can do whichever one we want to do in our discretion. That is the holding of Pearson. Yes. Yes. So why shouldn't we hold that you should follow the doctor's orders and not second guess some people who get hurt really bad? Because under the very particular circumstances of this case, I think another example that might be useful would be if Lieutenant Gentry had, say, brought in a wheelchair and told him don't use this cane pass and don't use this cane, we'll just put you in a wheelchair, that would also technically be disobeying what the cane pass said, but it would certainly be reasonable steps to mitigate a risk and it would certainly be some form of reasonable accommodation. And certainly this is not a case like Easter where there was somebody with heart problems that had some type of very serious cardiac need. This was a man in his 30s that they were only trying to take a very short distance to the shower. What difference does it make that he's young? You mentioned that several times. He's a person who has some disability and his age doesn't seem to be relevant. It might be a somewhat different case if he was, say, an 80-year-old man where a risk of a fall was a little bit greater. I'm not saying that's a dispositive fault. Why, don't we know that? That he's at any less risk than an 80-year-old man of a fall? He had a fall. His doctor said he needed a cane to prevent a fall. I don't think we, I think you're just, where does that come from, the idea that he's not at a great risk for a fall because he's not old? He's not in the record, is it? His age is in the record, yes. But the fact that he's not at a great risk because he's in his 30s, I don't believe that's   I don't know. I don't know. I don't know. I don't know. I don't know. His age is in the record, no. That, that, the idea This is just some argument. Well, of course, because it's a totality of the circumstance. Right, but it's a, there's no, there's nothing in here to indicate that he's any less frail than an 80-year-old. You're just using common sense to say that an ordinary 30-year-old is less frail than an 80-year-old. Sure, but I think that also goes to How does that go to the clearly, that goes to the clearly established Right, that goes to the question of objective reasonableness.   But he has specific problems that we're aware of from the record. So we can't just generalize about him. For, well, for purposes of prong one, I think another important issue is the risk versus the substantial risk of harm. And something that this court held in the, in the Jason versus Tanner case is there's a difference between knowing about a risk and knowing about a substantial risk of harm. And in that case, the court held that giving sling blades to prison inmates in a prison yard presented a risk, but not a substantial risk. And if that's the difference between a risk and a substantial risk, I think that simply taking an inmate 15 yards to the shower might be on the less substantial risks. Well, we also have the issue, a lot of people don't follow what their doctor says. So, I mean, the doctor might say I should take vitamin C every day, and then I don't. I don't really know what that necessarily means. And so I think that's a bit complicated. I understand, I mean, the cane is a little more serious perhaps than the vitamin C, but the point is doctors do give directives that are up here and they're not always the limited amount you might have to do, right? Yes, I think, I think, I think that's a fair assessment. But that's a choice for you to make when you're in the free world, not when you're incarcerated under somebody else's authority who gets to decide for you. But I think, again, I'm sorry, I'd like the, I'd like Mr. Mendelsohn to answer the question. Yes, it may be right that there is a difference between what Lieutenant Gentry encountered versus what Mr. Davis' preference was, which of course was to use the cane. But under the totality of the circumstances, we certainly submit that this was not an objectively  But we've also had a lot of cases where doctors have said you need to have this appointment or that appointment and the police, the officers haven't allowed that and that has not led to awarding a 1983. So I mean, there's a lot of things in the prison that are not as good as if you weren't in prison. And I don't necessarily agree that that's right, but it kind of is where things are, right? Sure, that may be. And I see my time has expired, so I have five minutes for rebuttal. Thank you. You've saved time for rebuttal. Good afternoons, Your Honors, and may it please the Court. My name is Samuel Weiss for Eppley. Mr. Davis? Mr. Weiss, can you tell us what the clearly established law is? That's a high burden. Yes, absolutely, Your Honor. The clearly established law is to not have a prison official violate a medical order in a way that creates a substantial risk of serious harm. That's how this Court articulated the right. What's your case that's closest to this one with a prison official, not a nurse, a prison official and some order from the doctor? On that note, Judge Haynes, so Easter v. Powell, now that involves a nurse, but if you look at the case, the defendant's argument, the nurse's argument was that they made a competing medical determination. And under Estelle v. Gamble, that's not a constitutional violation, even if it's medical malpractice. If you make a competing medical determination, that's not a constitutional violation. And what the Court held in Easter is no, the issue is not that there was a competing medical determination. The issue was that there was a failure to follow through with the medical order. And for the authority on that, it's cited to Estelle. But there have been plenty of cases where they haven't done everything the doctor wants done and that has not led to recovery on behalf of the prisoner. Your Honor, I didn't see those in Appellant's brief. Okay. So and Easter cites to Estelle for the proposition that carrying out a medical order by a prison official, not by a medical officer, by a prison official, creates deliberate, can create deliberate indifference when it's for a medical need. So although the facts of Easter happen to involve nurses, the claim is as a prison official failing to follow medical orders. And to Judge Elrod's point, it actually, and you can see this in the defendant's argument in Easter, it's a closer case if you have a medical official saying, who could at least plausibly say, I was exercising my own judgment and going a different way. Here we have absolutely nothing in the record to support that Lieutenant Gentry was qualified to know whether a cane or not was appropriate. Most of the, most of the cases that you cite seem to involve prison staff sort of completely blowing off, disregarding, ignoring medical needs. But can you point to any where prison staff used an alternative accommodation or an alternative medical treatment? Yes, Your Honor, it's an important question, and I think it might get to the main theme of what I'm going to discuss. But the answer is no, but we don't have to. And the reason is because virtually everything in the opening and reply brief and at argument today involves disputed facts over which this court has no jurisdiction. So the suggestion is that Lieutenant Gentry offered an alternative. Again, for what purpose? She was on notice of a medical order. Why was this necessary? For security. Yes, as opposed to being shackled in the front to go 15 yards that a man who had just been stabbed 18 times in the leg had to be shackled in the back, even though he had a medical order requiring him to do so when surrounded by three prison guards. That's the nominal justification. But what we have here, and my colleague on the other side read from 770 and 77D1 a couple times from my client's testimony, who said, they were right out there ready to grab me. And then she testified, but they didn't grab me, they just watched me fall, they didn't grab me or nothing, they didn't do what they said they were going to do. That's the factual dispute. Okay, but that's what Gentry thought they should do, but they didn't do. So that's a different thing, suing them is a different thing from suing Gentry. Absolutely, Your Honor. If I tell you to do something and then you don't do it, who is the person at harm there? That's a really important question. I just wanted to clarify this first important question. Did you tell the officers in this record? It's unclear on the record, Your Honor, as my colleague on the other side said. So to get to... Do you know this guy? Does she have any motive whatsoever in this record? You can't use an after-the-fact thing. Well, Your Honor, I actually think we can. I'm talking about this guy, your client. Yeah, yeah, yeah, I understand. So to answer your question and Judge Haines's question both, I think, so she says, we're going to catch you, and then the two men do not catch him, they just watch him fall. Now, of course, defendant's version of the facts, which they'll have the opportunity at trial, is entirely different. It's that he threw himself down on purpose to injure himself, to make their lives more convenient. But under Davis's version of the facts, he falls down, they do not help him, then they... It's actually... He's laying there on the ground. He's laying there on the ground. They wrestle him around in a way that injures him, again, for security purposes. What security problem this man could possibly pose at this moment, I don't understand. Then they... It's actually undisputed that they go through his objects and destroy a bunch of them, and they sanction him for creating a disturbance. Now, that's consistent with defendant's version of the story, which... That's after the fact, though. It's after the fact. If I've never met you before, but then you insult me now, and then I do something to you after that, that doesn't prove that I walked in the door to hurt you. Absolutely. I would do that. Certainly not. I would, though. No, absolutely not. What... There's no indication that they knew each other before, right? There's nothing in the... No indication that she had something against him before? No. So, whatever happened after could have been fueled from what happened here. It's... There's no other fuel. It's possible, Your Honor, but again, I think we're veering into reevaluating factual inferences in a way that this court doesn't have jurisdiction over. But also, to this point, there's nothing consistent with the idea that she wanted the men to catch them, they're the ones who made the mistake, and then she, you know, you think might feel sorry or bad or something. Instead, she punished him, and she sanctioned him seriously through the discipline. It was the same day. It was creating a disturbance by throwing himself on the ground. That's what she accused him of doing. So there's just... There's nothing in the record to support this conclusion, and that's point one to your point, Judge Haynes, about, you know, the difference between gentry versus the individual officers. The second point about gentry versus the individual officers is defendants never advance an argument in the district court or hear that it was the officers who engaged in misconduct and not a lieutenant gentry. It was always that there was no misconduct at all. Did you have anything else? Sure, Your Honor. Judge Willard, do you have a question? No, I just wanted you to circle back to the one I asked a few minutes ago. Yes, please. I'm sorry. Could you remind me? Sure. We've traversed some ground. That's all right. That's all right. Most of the cases that you cite, they involve prison staff who completely ignored medical needs. But I asked if you could point to any cases where prison staff used an alternative medical treatment or accommodation, and you said no, but you didn't have to, and then you were going to unspool that a little bit. Yeah, because what we have here is, of course, it's... I get it from my colleague on the other side that Lieutenant Gentry just wanted to help. Lieutenant Gentry forbid him from using a cane. She created the risk, this idea that at least she did something reasonable to abate the risk. She created the risk, and then to abate it, the idea was that she was going to provide manual support, but she didn't provide manual support. We have record evidence that he testified at 772 that he said they didn't do what they said they were going to do. I just fell, and they watched me. So this characterization of what Gentry actually did, I don't think is giving Davis the inferences that he's owed, especially in the context of an interlocutory appeal where we have limited jurisdiction. What if she had come with a wheelchair? That would obviously be totally fine. That'd be fine? Yes. In the rule that I want to create, it seems like it would have an exception right away off the board. I don't think so, Your Honor. I think it's stacking qualified immunity on top of an already very challenging-to-meet Eighth Amendment standard. You have subjective and objective prongs. You need to knowingly disregard a substantial risk of serious harm, and for qualified immunity purposes, we're stacking on top the idea that it needs to be in violation of a medical order. What do you say to someone who says, well, the fact that she said that they were going to help him, and the fact that she didn't know him already, means that we can't assume she was lying or misleading him, that we have to take it at face value, and that she really intended to help him? Well, I would say that her actions following the incident are not remotely consistent with that, and that also that defendant never raised that argument below and never raised that argument. Perhaps a final point is that, again, virtually everything discussed, opening brief, reply brief, involves disputed facts, their characterization of the relevant constitutional right. It's not only so specific that it will never occur. It actually has disputed facts inside of it. So this court has no jurisdiction over disputes of facts or sufficiency of the evidence type arguments, and one really important subcategory of that is my colleague on the other side used as prong two. Can you tell me where in the record the district court found it was a disputed fact that she was, by what she was saying, she was instructing the officers to hold on to him? No. The district court doesn't make that fact specifically. Okay. So we do have jurisdiction, because the thing we don't have jurisdiction over is the genuineness of disputed facts, but the district court did not find this to be a disputed fact. That's right. They both agree on what she said. That's right. So that's correct, Your Honor. But whether she subjectively drew the inference as needed for the Eighth Amendment standard is itself a question of fact. So this isn't an objective standard like the Fourth Amendment in most qualified immunity cases. There is a subjective prong. Either she did draw the inference that she was creating a substantial risk of serious harm, or she did not. It's an empirical question, as Farmer v. Brennan, this is at 842, if this is helpful, in the that whether a prison official knowingly disregards a substantial risk of serious harm is a question of fact, and it is to be evaluated in using circumstantial evidence or other ways we can get to questions of fact. So my colleague on the other side, his prong, too, was that we had not sufficiently contested the argument that she subjectively drew the inference. That's a question of fact. This court has no jurisdiction to review disputed questions of fact. The district court found that she did have the relevant mens rea for a deliberate indifference standard, and that's not something this court can review. Hypothetically, and you'll dislike the premise, but bear with me. Sure. Say we rule for the other side on prong two. Should we leapfrog prong one? Should we articulate something under prong one? And if so, how should we articulate it? Your Honor, I think it would be if this court wanted to reach prong one and establish a constitutional violation here because it found Lawson and Easter were insufficiently specific, something to do perhaps with an ambulatory disability that taking away a person's ability to move and protect themselves as the objective prong when paired with the subjective prong of knowing that it creates a substantial risk of serious harm, that that's a constitutional violation. I think that could be a prong one. If we're going to lose on prong two, I would just say on the clearly established inquiry that I really think that this, if, and I understand this is a thorny subject, exactly how general to draw the line, and in the Eighth Amendment context versus the Fourth Amendment context, I think the proper way to dispose of the case, if you all, if, pardon me, if the panel feels that affirmance on grounds that this articulation of the constitutional right is specific enough, if this, if this court found that to be unpersuasive, I think this court could either affirm on the grounds that appellant has raised no argument over which this court has jurisdiction. There is, there is no argument that does not include disputed facts. Or at, at the very least, if this court found that the district court was insufficiently specific in defining the constitutional right, this court in the past has vacated and remanded with the instruction to engage in a more thorough kind of analysis. But, but just to get back to the jurisdictional point, by, by focusing on the, the exclusively on disputed facts, on the subjective prong, which is itself a question of fact, on the objective prong, but only taking into account the idea that he was actually provided manual support when in fact he was not, and, and then her post-fall actions, which are entirely inconsistent with the idea that, that she was acting in any kind of, you know, good, that this was some sort of good faith mistake. Now, it's consistent with defendant's version of the facts, but that's just completely different from Mr. Davis's, that, that there's nothing, there's nothing to full and out reverse here that this court actually has jurisdiction over. I think we have your argument. Thank you very much, Your Honors. Mr. Mendelson, do you have rebuttal? No, I want to ask your response to the notion that you can consider what happened afterwards since it was shortly thereafter that she started, you know, basically stabbing him virtually. What about that? I, I don't believe there's any evidence in the, in the record suggesting that, that Lieutenant Gentry stabbed Mr. Davis. I'm saying virtually. I'm making a little bit of a, talking about the things that she did in his room and all the things that your opponent mentioned, I'm not saying she personally stabbed him, but she was virtually stabbing him. What about that? Does that provide some evidence that, yes, she was being deliberately indifferent? I don't think so, and the reason for that is, I, I think it's important for the court to analyze what the substantial risk of serious harm was, if it was indeed a substantial risk of serious harm, and that was the risk of somebody falling, and because of her statements and because she even immediately called for help after he fell, those things show that she was focused certainly on the risk of the fall, and so whether she got into a verbal altercation with him, and as to the, the cell search claim, which of course the district court already granted summary judgment on, that, that may, that may show that she had gotten into a verbal altercation with him, but that doesn't show . . . Does the district court granted summary judgment on the cell search mean it's out of the picture? We, we, we certainly, we certainly think that because the district court granted summary judgment on the cell search, it's, it's not before this court, and, and because of, because of her statements about the actual risk of harm, the facts that go to the cell search claim, because those facts are not about the harm of the fall itself, we don't think that they're relevant to, to that analysis. How do you know she didn't like him? If, if, if, if that, if that is, if that is the inference that, that the court wants to draw, there's certainly other facts showing that she tried to help him multiple times as to the fall, as to the fall itself, which is the only risk of harm. I'm just wondering, is it possible for us to consider, let's assume arguendo, really nasty stuff after this that she did, can we consider that in determining whether she was acting with deliberate indifference or really intentional indifference at the time that she didn't know him? I, I don't think so, because those facts aren't about the fall, and, and, and the facts, the facts would have to be about the fall to determine whether or not she was subjectively inferring a risk of a fall, and I, I, I want to. Turning to the fall, so the quote, as I wrote it down, was, they didn't do what they said they were going to do, that's the quote. So, is the record clear as to whether there was an actual attempt to substitute Davis' cane with the physical support of guards? I think the record reflects that, that at the very least, Lieutenant Gentry believed that that is what they were going to do, because it happened over a very short period of time. The record shows that the cell door opened, he took one step, and he fell, and that would have only been something that could have happened over the course of a couple of seconds, that the record does reflect that at the very least, Lieutenant Gentry thought that that's what she was going to do or thought that that's what the officers were going to do, because, because of her statements, and I, I do want to be sure to address something my friend on the other side said, which is, the question of Lieutenant Gentry's state of mind is properly before this Court, it's, it's not a question of fact in the sense that this Court has held in cases like Cunningham and Haggerty versus the University of Texas, I believe, that the Court may accept the plaintiff's version of the facts to the extent they are supported by the summary judgment record, and may make a qualified immunity determination on those facts to the extent they are supported by summary judgment evidence, and so that, that is properly before this Court on jurisdiction, and another point that I want to be sure to make is my friend on the other side was referencing the Easter case and the Estelle case, again, because those cases are about nurses, and because the case of Estelle is about whether a doctor did a sufficiently proper job in treating a patient, those cases do not clearly establish law for, for the purposes of this case, and I think there's one other point that I want to be sure to emphasize, which is that, again, we are not suggesting that a prison official may categorically, um, and under any circumstance, simply, simply ignore a doctor's order. We're simply suggesting that on these particular facts, it was a reasonable thing to do, even if maybe it was not the best thing to do, and that, and that's the analysis that's material. The same question I asked Mr. Weiss. Um, if we were to tackle prong one, what would be your suggestion on how to articulate the constitutional violation? Uh, of course, of course, we don't think there was a constitutional violation. I see my time has expired. May I answer the question? Yeah, assuming we pivot on prong two, and say, even if there was a violation, it wasn't clearly established, but were we to find a violation, I know that in your heart of hearts, you would not wish that, but if we were, any suggestions on the articulation? Well, it would have to be, as, as, as this court has held with specificity and granularity, it would certainly have to be something about the ability of how to handle a situation of moving, maybe moving a prisoner a short distance, um, with some, perhaps with some type of injury. It would have, it would have to be at that level of granularity, and I see, I see that my time has expired. Thank you. We have your argument, and this case is submitted.